IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| J. CRUZ CABRERA, individually and as parent and guardian of minor children L.R. and S.R., and ROSIE GRAHAM, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 9:23-cv-80 |
| SOUTHERN HEALTH PARTNERS, INC.; DR. JOB MONGARE; and ANGELINA COUNTY, | § § § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs J. Cruz Cabrera, individually and as parent and guardian of minor children L.R. and S.R., and Rosie Graham file this Original Complaint against Southern Health Partners, Inc., Dr. Job Mongare, and Angelina County, and would respectfully show the Court as follows:

### I. INTRODUCTION

Southern Health Partners ("SHP") contracted with Angelina County to provide the medical care at the County's jail. However, SHP's business model does not provide medical care that conforms with Texas law. The medical care at numerous correctional facilities SHP is contracted to work with in Texas is provided almost exclusively by licensed vocational nurses, whose licenses prohibit them from making medical assessments, diagnoses, or treatment decisions. Nonetheless, these nurses perform all of those tasks at SHP's facilities. Furthermore, the LVNs are virtually completely unsupervised. At Angelina County, the only medical provider whose license allows assessments, diagnoses, and treatment decisions is a physician's assistant, who is only at the jail for a few hours per week. During that time, the PA sees a few patients in

need of more acute care, but does nothing to supervise the nurses or oversee the care they provide to the other patients. Moreover, a PA's license requires active supervision by a licensed physician, but the "medical director" of the jail—Dr. Mongare—is the director in name only. He is never physically present at the jail, does not consult with the staff there, does not supervise the PA or the staff in any way, and is only paid approximately $100 per month for the sole purpose of allowing SHP to list him as the responsible physician. Make no mistake: SHP's entire system is nothing short of a sham. The County was well aware that the "medical care" provided by SHP was an illusion, but allowed it to continue because SHP was saving the County a lot of money.

Wendy Cabrera was highly intoxicated when she was arrested on April 7, 2021 and taken to the Angelina County Jail. Her blood–alcohol level was measured as .28—three-and-a-half times the legal limit to operate a vehicle. Jail personnel knew she had a history of alcoholism and seizures. Despite this, they kept her at the jail instead of taking her to a hospital. Cabrera was placed in general population, instead of in a medical observation cell. SHP and jail staff did nothing to monitor Ms. Cabrera's health, despite the fact that she was certainly going to experience alcohol withdrawal at the jail and was highly likely to suffer extreme adverse effects from it. Approximately 30 hours after her arrest, Ms. Cabrera suffered a seizure and lost consciousness. She was eventually taken to a hospital, but never regained consciousness and died on May 1, 2021.

## II.  PARTIES

1. Plaintiff Rosie Graham is a resident of Angelina County, Texas.

2. Plaintiff J. Cruz Cabrera is a resident of Angelina County, Texas.

3. Plaintiff L.R. is the minor son of Wendy Cabrera and a resident of Angelina County, Texas.

4.     Plaintiff S.R. is the minor daughter of Wendy Cabrera and a resident of Angelina County, Texas.

5.     Defendant Southern Health Partners, Inc. ("SHP") is a Tennessee corporation that contracted with Angelina County to provide the medical care at the Angelina County Jail. SHP may be served through its registered agent, CT Corporation System, 1999 Bryan St. Suite 900, Dallas, TX 75201.

6.     Defendant Angelina County is a political subdivision of the State of Texas and may be served through its county judge, Keith Wright, Angelina County Denman Bldg., 102 W. Frank Ave., Lufkin, TX 75902.

7.     Defendant Dr. Job Mongare is a resident of Henderson County, Texas and may be served at his place of business, 113 N. Murchison St., Athens, TX 75751.

### III.  JURISDICTION AND VENUE

8.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983. Supplemental jurisdiction over state law claims against SHP and Mongare is proper under 28 U.S.C. § 1367, because those claims are so related to the claims under § 1983 that they are part of the same case.

9.     Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in that district.

## IV.  FACTS AND ALLEGATIONS

### *Wendy Cabrera's Arrest, Detention and Death*

10. Wendy Cabrera was arrested on April 7, 2021, at approximately 1 p.m.  The arresting officers observed her to be highly intoxicated.

11. Arresting officers communicated to jail staff that Cabrera was highly intoxicated, which was obvious in any event by her appearance and behavior.  At some point, her blood–alcohol level was measured at .28—three-and-a-half times the legal limit to operate a vehicle (although Cabrera was on foot when she was arrested).

12. Jail staff was familiar with Cabrera and knew she had a history of alcoholism and seizures.

13. Anyone who drinks alcohol regularly and suddenly stops is at risk of suffering withdrawal symptoms.  The risk of suffering severe adverse effects rises relative to the length of time a person has been drinking regularly and the amount that they drink.  As such, Cabrera was a high-risk candidate for severe adverse withdrawal effects.  Her history of seizures made it especially more likely that withdrawal would induce a seizure.  Alcohol withdrawal usually occurs during the first 48 hours after the cessation of drinking.

14. Cabrera should have been taken to a hospital immediately.  Severe alcohol withdrawal requires assessment by a physician and frequent monitoring for dangerous symptoms such as seizure activity.

15. Instead, Cabrera was placed in general population, instead of a medical observation cell.  She was never assessed by a physician.  Jail staff and medical staff completely failed to monitor Cabrera's health in any way.

16. In fact, no medical staff of any kind is present at the jail overnight. The non-medical correctional officers have no medical training whatsoever, and are therefore incapable of recognizing when a person is in need of medical attention.

17. At some point in the late afternoon of April 8, Cabrera suffered a major seizure, lost consciousness, and collapsed in her cell. The EMS technicians who transported Cabrera to the hospital reported that it was unknown how much time elapsed before jail medical staff responded, from which it may be inferred that the response was not immediate. It is likely that a medically significant amount of time passed after Cabrera collapsed before medical staff responded.

18. Eventually, an ambulance was called, and Cabrera was transported to the hospital at approximately 6 p.m.

19. Cabrera never regained consciousness and died on May 1, 2021.

### *SHP's Sham System of "Medical Care"*

20. Angelina County contracted with SHP to provide all of the medical care at the jail. The Angelina County Sheriff was aware of and approved the terms of the contract.

21. All of the nurses at the jail were employed by SHP.

22. The contract, and the system of service instituted by SHP, are fundamentally flawed in that they rely almost entirely on the unlicensed practice of medicine.

23. Licensed vocational nurses provide nearly all of the medical care at the jail without any supervision. However, the LVN license does not allow these nurses to make diagnoses or treatment decisions. The LVN role is instead that of an "information gatherer," who is then supposed to pass on that information to a higher-level practitioner to make diagnoses and treatment decisions.

24. However, the higher-level practitioners at the Angelina County Jail do no such thing. There is a single physician's assistant who comes into the jail—at most—once per week for a few hours, for the sole purpose of seeing a very small number of patients requiring extra attention. The PA does nothing whatsoever to supervise the nurses, and takes no part in the medical care provided to all of the patients he doesn't see directly (which is the vast majority of them).

25. Moreover, a physician's assistant is required by law—as the name implies—to be actively supervised by a licensed physician. This does not happen at the Angelina County Jail. Thus, the PA is acting outside the scope of his licensed when he provides unsupervised medical care at the jail. *See* TEX. OCC. CODE §§ 204.202(a), 204.204(b).

26. The only licensed physician officially connected to the jail is Defendant Dr. Mongare, who is the "medical director" at the Angelina County Jail and several other facilities that contract with SHP in Texas.

27. However, Mongare never sets foot inside the jail. He never sees any patients there. He does nothing whatsoever to supervise the PA or the nurses at the jail. In short, he does not participate in the "medical care" provided at the jail in any way. A PA who worked at the Angelina County Jail from approximately 2014 through 2019 has testified that he never met Mongare, did not recall ever speaking to him on the phone, and never sent him anything to review. He admitted that Mongare was his supervising physician in name only.

28. Mongare's lack of actual participation is further evident from the fact that he is paid only approximately $100 per month to be the "medical director" at the jail.

29. The contract between SHP and the County is facially deficient in that it does not require a "professional provider"—which it defines as a "physician or mid-level practitioner"—

to be present at the jail at all. It only requires them to be "available to our nursing staff for resource [sic], consultation and direction twenty-four hours per day, seven days per week."

30. Additionally, the contract only requires sixteen "nursing hours" per day, leaving at least eight hours when no medical staff is present at the jail. The "no-staff" period may in fact be longer, if there is any overlap between two eight-hour nursing shifts per day.

31. This arrangement would be fundamentally insufficient and in violation of Texas law even if the nursing staff actually contacted the doctor and/or PA regularly. However, in practice, such consultation is rare. Consultation with Dr. Mongare is virtually non-existent, which again is apparent by his virtually non-existent compensation.

32. Since no licensed practitioner spends any significant time at the jail, the LVNs are constantly making diagnoses and treatment decisions they are unqualified to make. They even prescribe medication—another task clearly outside their scope of practice—based only on written "protocols" that are highly generic in nature and not based on the examination of any particular individual.

33. Also, none of the non-medical correctional staff is provided any medical training whatsoever, so they are completely unqualified to determine whether an inmate is in need of emergency medical care.

34. Additionally, the contract expressly states that SHP is to provide and/or arrange emergency medical care only "as medically necessary." However, the contract does not state who is to make the determination that any particular emergency care is "necessary." Given the reality that no one with more authority or expertise than an LVN is required to be present at the jail, this means that all such determinations are being made by LVNs, who are not qualified to do so.

35. This provision in the contract was intentionally included by SHP and the County as part of a concerted effort to minimize the use of outside medical care, which the County would have to pay for. A former SHP nurse from the Angelina County Jail has stated that the sheriff himself advised her to send as few inmates to the hospital as possible.

36. The system described above was intentionally instituted by SHP for the purpose of saving money and obtaining contracts by offering counties lower prices than their competitors. SHP's regional director, Stephanie Self, is well aware that the system employed by SHP functions exactly as described above, based on prior testimony.

37. Angelina County, as well as its sheriff and jail administration, also knows that the service provided by SHP functions exactly as described above and does not constitute "medical care" that would be legally recognized in Texas. This is from both direct involvement with contract negotiations and direct observation of daily operations at the jail.

38. In other words, SHP and the County are deliberately playing a kind of "shell game," where they appear to be providing medical care on paper, but in fact are not. Outside observers would have little reason to believe the service was based on the unlicensed practice of medicine unless they carefully parsed the contract terms and also knew that the physician was present at the jail. This fact is further disguised by SHP nurses stamping Dr. Mongare's signature on treatment orders, even when he has never seen the patients and has not been consulted about them.

39. Indeed, the County employed SHP (and renewed its contract at least once) despite knowing that it was the subject of countless lawsuits accusing it of substandard medical care. SHP is also substantially cheaper than most of its competitors, which is an indication of the quality of service it provides.

40. Taken together, the express policies described above prevent anyone incarcerated at the Angelina County Jail from receiving adequate medical care, including Wendy Cabrera.

41. As described above, Cabrera's death was caused by the jail's (and SHP's) total failure to monitor her health, despite knowing that there was a serious risk that she would suffer severe adverse effects from alcohol withdrawal within the first day or two after she was arrested.

42. That failure to monitor, in turn, was caused by the abjectly deficient—and facially unlawful—"medical care" provided at the jail. As described above, this was not really medical care at all, since it relied almost entirely on the unlicensed practice of medicine. During a substantial portion of time in which Cabrera was withdrawing from alcohol at the jail, there was no medical staff there at all.

43. SHP was well aware that this total lack of physician presence at the Jail was grossly insufficient. In 2015, SHP accepted a contract to provide medical care at the Grant County Detention Center (GCDC) in Kentucky. One of SHP's primary assignments was to correct deficiencies found at GCDC in a 2005 U.S. Department of Justice (DOJ) investigation report. As such, it was intimately familiar with the report's findings.

44. The DOJ had found that the medical care at GCDC was inadequate, appeared "to result primarily from the shortage of medical staff at the facility." The DOJ pointed out that "[a] physician on-site for two to three hours per week . . . is clearly insufficient to provide the medical care required for an institution the size of GCDC." Further, the DOJ found that GCDC "lacks policies on, *inter alia*, timeliness of access to medical care," or "protocols for the nurse or the correctional staff to use to ensure timely access to the physician when presenting symptoms requiring physician care." Moreover, "many of [the] facility's policies and procedures lack the breadth and specificity to form an infrastructure to ensure timely access to the appropriate level"

of medical care. Additionally, the DOJ found that the GCDC failed to keep organized and sufficiently detailed medical records, which contributed to the failure to provide adequate medical care.

45. By 2017, GCDC had still not been brought into compliance with the agreement it had made with the DOJ.

46. For comparison, with a capacity of 279 inmates, the Angelina County Jail is nearly the size of GCDC (350). If having a physician on site for 2-3 hours per week was "clearly insufficient" for a 350-bed facility, an unsupervised physician's assistant who did not have to be on-site *at all* is even worse, even at a slightly smaller facility.

47. Moreover, the medical care at the Angelina County Jail suffers from all the other shortcomings of infrastructure that had been pointed out at GCDC by the DOJ. Still, despite knowing that a system with these shortcomings was woefully deficient, SHP instituted a similarly deficient system in Angelina County.

48. Finally, SHP and the County were aware that at least one other inmate had recently died at the jail as a result of this woefully inadequate system of medical care—after languishing for weeks with completely untreated pneumonia—but did nothing to improve the system and continued operating without any actual participation by a licensed physician or any supervision of the nursing staff and physician's assistant. *See Lambert v. Angelina County et al.*, Civ. Act. No. 9:20-cv-97, Eastern Dist. of Texas, Lufkin Division.

## V.  FIRST CAUSE OF ACTION: NEGLIGENCE BY DEFENDANTS SHP AND MONGARE

49. All above paragraphs are incorporated herein by reference.

50. Negligence claims against SHP are asserted by all Plaintiffs in all capacities.

51. Negligence claims against Dr. Mongare are asserted only by Plaintiff Cabrera as parent and guardian of L.R. and S.R.

52. SHP, through its contract with Angelina County, had a duty to provide medical care to inmate–patients at the Jail, including Wendy Cabrera.

53. SHP staff knew that Cabrera was at high risk of suffering severe adverse effects from alcohol withdrawal during the first two days of her incarceration.

54. Nonetheless, SHP staff did not take Cabrera to a hospital or monitor Cabrera's health in any way.

55. Cabrera suffered a seizure approximately 30 hours after her incarceration began, which was a highly foreseeable result of alcohol withdrawal, especially for someone with a history of seizures, of which jail and medical staff were aware.

56. This seizure would more likely than not have been avoided (or its effects mitigated) if medical staff had appropriately monitored and treated Cabrera, and/or had transported her to a hospital due to observed symptoms of alcohol withdrawal and her history of seizures.

57. Alternatively, due to the failure to monitor Cabrera, SHP staff took too long to respond after she collapsed with a seizure.  Had they responded in a timely fashion, Cabrera's life would more likely than not have been saved.

58. SHP may be liable either (a) vicariously for the negligence of its employees in failing to monitor and/or properly treat Cabrera, or (b) for the negligent system of care it

provided at the jail, including woefully insufficient and unqualified staffing, that caused Cabrera to be improperly monitored and/or treated.  This latter theory of liability may be viewed as negligence *per se*, since SHP was violating Texas law by engaging in the unlicensed practice of medicine.

59. Dr. Mongare, like SHP, assumed a duty to care for his patients at the jail when he agreed to be the medical director of the jail.

60. However, Mongare did nothing at all to provide any medical care himself to any inmates at the jail.

61. Further, he did not supervise any staff at the jail, despite knowing that they could not legally provide medical care without supervision by a licensed physician.  Mongare knew that no other physician was supervising the jail medical staff.

62. This total failure to supervise the staff and acquiescence to SHP's facially unlawful system of medical care breached Mongare's duty to his patients at the jail, including Cabrera.

63. As described above, this resulted in the failure to monitor and/or properly treat Cabrera, causing her death.

### *Gross Negligence*

64. Instituting a system of medical care at the Angelina County Jail as described above involved an extreme degree of risk, considering the probability and magnitude of the potential harm to inmates at the jail.

65. SHP had actual, subjective awareness of this precise risk from its experience with GCDC and the DOJ report, but consciously ignored this risk.

66. Moreover, SHP and the County were aware that at least one other inmate had recently died at the jail as a result of this woefully inadequate system of medical care, but did nothing to improve the system and continued operating without any participation by a licensed physician or any supervision of the nursing staff and physician's assistant. *See Lambert v. Angelina County et al.*, Civ. Act. No. 9:20-cv-97, Eastern Dist. of Texas, Lufkin Division.

### *Wrongful Death and Survival Causes of Action*

67. This suit is brought under the Texas Wrongful Death Statute (Tex. Civ. Prac. & Rem. Code § 71.001, et. seq.) by Wendy Cabrera's surviving mother (Rosie Graham), husband (J. Cruz Cabrera), and children (L.R. and S.R.), who seek to recover all damages permitted by that statute.

## VI. SECOND CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983 BY ANGELINA COUNTY AND SHP

68. All above paragraphs are incorporated herein by reference.

69. Claims of constitutional violations under § 1983 are brought against Angelina County and SHP by all Plaintiffs in all capacities.

70. Pretrial detainees such as Wendy Cabrera have a right to adequate medical care.

71. Angelina County has a non-delegable duty to provide adequate medical care to inmates at its jail; if it delegates that medical care to a contractor, both the County and the contractor have the same duty to provide adequate medical care. Private persons and/or business entities providing medical care at a county jail are state actors for the purposes of § 1983, since they are providing a service normally provided by the government.

72. The County entered into a contract with SHP to provide the medical care at the jail. The sheriff and/or other relevant policymakers for the County's jail, as well as SHP's policymakers, approved the terms of the contract.

73. As described above, the medical staffing required by the contract and implemented by SHP was facially insufficient. In short, LVNs were tasked with providing medical care far outside their scope of practice, such as making diagnoses and treatment decisions. No licensed physician was providing any medical care at the jail or supervising other medical staff. This constitutes the unlicensed practice of medicine, which violates Texas law and is *per se* inadequate under the U.S. constitution. This system of staffing was the express policy of SHP and the County.

74. Generally, only one nurse was on staff at any given time at the jail, and there was no medical staff present at all for at least eight hours per day

75. Additionally, non-medical correctional staff was not trained at all to recognize medical emergencies that required professional attention, and thus were incapable of doing so.

76. Finally, SHP and the County deliberately acted to minimize the use of outside medical care as a cost-saving measure. Such outside care was only allowed when "medically necessary," and the determination of when such care was necessary was intentionally left to unqualified LVNs. Further, the nurses were actively discouraged from approving any patients for outside medical care.

77. These express policies prevented Wendy Cabrera from getting adequate medical monitoring and treatment, ultimately resulting in her death.

78. Alternatively, SHP may be vicariously liable for the constitutional violations of its employees at the jail.

## VII. THIRD CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983 BY DR. MONGARE

79. All above paragraphs are incorporated herein by reference.

80. Dr. Mongare took on the inmates at the jail as his patients when he agreed to be its medical director.

81. However, Mongare did literally nothing to provide any medical care at the jail or supervise the medical staff there.

82. Furthermore, he knew that the nurses were regularly acting outside the scope of their license. He also knew that the nurses and the physician's assistant were practicing medicine without any supervision by a licensed physician, which is unlawful.

83. Nonetheless, he allowed all this to go on and took no steps whatsoever to ensure his patients at the jail were receiving adequate care.

84. This total failure caused Wendy Cabrera to be unmonitored and improperly treated despite the jail staff's knowledge that she was highly intoxicated, an alcoholic, and had a history of seizures. The lack of monitoring and proper treatment in turn caused Cabrera's death.

## VIII. DAMAGES

85. As a direct and proximate result of the above-described acts and omissions of Defendants, and/or individuals for whom the Defendants are legally responsible, Plaintiffs, and those interests that Plaintiffs legally represent, have suffered serious damages. J. Cruz Cabrera, as Wendy Cabrera's husband and as parent and guardian of Wendy Cabrera's minor children L.R. and S.R., and Rosie Graham as Wendy Cabrera's mother, seek damages under the Texas wrongful death statute. Plaintiffs also seek the same damages under any applicable federal law.

86. Accordingly, Plaintiffs seek to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct. These damages include, but are not necessarily limited to, the following:

   a) All reasonable and necessary burial expenses associated with Wendy Cabrera's death;

   b) J. Cruz Cabrera's mental pain and anguish arising from the death of his wife, both past and future;

   c) J. Cruz Cabrera's damages arising from the loss of companionship and society of his wife, both past and future;

   d) J. Cruz Cabrera's damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that he would have received if Wendy Cabrera had lived, both past and future;

   e) Rosie Graham's mental pain and anguish arising from the death of her daughter, both past and future;

   f) Rosie Graham's damages arising from the loss of companionship and society of her daughter, both past and future;

   g) Rosie Graham's damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that she would have received if Wendy Cabrera had lived, both past and future;

   h) S.R.'s mental pain and anguish arising from the death of her mother, both past and future;

   i) S.R.'s damages arising from the loss of companionship and society of her mother, both past and future;

   j) S.R.'s damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value she would have received if Janet Hartman had lived, both past and future;

   k) L.R.'s mental pain and anguish arising from the death of his mother, both past and future;

    l) L.R.'s damages arising from the loss of companionship and society of his mother, both past and future;

    m) L.R.'s damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value he would have received if Janet Hartman had lived, both past and future;

    n) Punitive and/or exemplary damages against SHP and Dr. Mongare; and

    o) Pre- and post-judgment interest in accordance with Texas law.

### IX.  JURY REQUEST

87. Plaintiffs request a trial by jury.

### X.  REQUEST FOR RELIEF

Plaintiffs request that this Court, after final trial of this cause, grant judgment in favor of Plaintiffs and against Defendant for compensatory and actual damages; costs of Court; pre-judgment and post judgment interest as may be allowed; and such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

By: /s/ *Don Tittle*
Don Tittle
State Bar No. 20080200
don@dontittlelaw.com
Law Offices of Don Tittle, PLLC
8350 N Central Expressway Suite M1085
Dallas, Texas  75206
(214) 522-8400
(214) 389-1002 – Fax

***Attorney for Plaintiffs***